IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 1:20-CR-289-RP-3 |
| | § | |
| BENNY DANESHJOU, | § | |
| | § | |
| Defendant. | § | |

## ORDER

Before the Court are several motions to suppress, (Mots. Suppress, Dkts. 432, 433, 434, 435, 666), two motions in limine, (Mots. Limine, Dkts. 431, 1062), a motion to reconsider, (Dkt. 922), a motion to reopen the suppression hearing, (Dkt. 1052), and a motion for the Court to assist in preparing declarations and subpoenaing witnesses, (Dkt. 925), filed by Defendant Benny Daneshjou ("Daneshjou"). The United States of America ("the Government") filed a consolidated response to the motions to suppress, (Dkt. 690), and the Court held a hearing on the matter on April 9, 2024, (Dkt. 918). Also before the Court is the Government's motion for a hearing on Daneshjou's motion to reconsider, (Dkt. 929). For the reasons discussed below, the Court will deny Daneshjou's motions to suppress, motion to reopen, and motions in limine. The Court will also moot the motion to reconsider, the motion for the Court to assist in preparing declarations and subpoenaing witnesses, and the Government's motion for a hearing on Daneshjou's motion to reconsider.

## I. BACKGROUND

Beginning in 2019, Austin Police Department ("APD") Task Force Officers and Drug Enforcement Administration ("DEA") learned that Charles Zenker and Varun Prasad were distributing large quantities of controlled substances. In May 2019, Prasad provided information to

Government officers that Zenker was a drug distributor. Based on this and other information, a warrant was executed at Zenker's apartment where drugs and other evidence were seized.

In August 2019, a confidential source provided information to the Government that Prasad was still distributing drugs despite the pending investigation into Zenker. Officers then began another investigation that resulted in several "buy-walk" operations, in which targets working for Prasad delivered LSD, MDMA, fentanyl, methamphetamine and other drugs to undercover officers. The Government contends that Prasad sought help identifying properties to purchase to launder his drug proceeds. During this operation, agents and officers obtained recordings of several calls made between Prasad and Defendant Benny Daneshjou, an Austin real estate developer. They also noticed several payments worth tens of thousands of dollars made between Prasad and various LLCs associated with Daneshjou. Based on this information, the Government identified Daneshjou as a potential member of the drug trafficking and laundering conspiracy.

A grand jury indicted Daneshjou on November 17, 2020, charging him with conspiracy to traffic a controlled substance and conspiracy to engage in money laundering. (Indictment, Dkt. 116). Via his original counsel, Stephen M. Orr, Daneshjou filed several motions to suppress the results of searches on his property at 2300 Portofino Drive, electronic surveillance of conversations between him and Prasad, and statements he provided to law enforcement officers following his arrest. (*See* Dkts. 432–435). He also filed a motion in limine seeking to exclude any extraneous references to other criminal conduct. (*See* Dkt. 431).

Daneshjou then obtained new counsel, Richard Gentry, who filed one motion to suppress the search of his residence on Portofino Drive. (Dkt. 666). The Government filed a consolidated response on August 27, 2023. (Dkt. 690). Following several continuances, the Court held a hearing on the matter on April 9, 2024. (Dkt. 918). Two law enforcement officers testified at the hearing, and Daneshjou, proceeding *pro se*, made arguments on his own behalf. At the hearing, the Court

2

informed Daneshjou that he must proceed to trial on April 29, 2024, even if he did not have counsel. (Minute Entry, Dkt. 918).

After the hearing, Daneshjou filed a motion for reconsideration of the Court's ruling that Daneshjou must proceed *pro se*, (Dkt. 922), and a motion for the Court to assist him in preparing declarations and subpoenaing witnesses, (Dkt. 925). The Government moved for a hearing on Daneshjou's motion for reconsideration, (Dkt. 929), and Daneshjou filed a response, (Dkt. 931).

On April 24, 2024, the Court appointed counsel, Russell Hunt, Jr., (Order, Dkt. 936), and cancelled the April 29, 2024, trial in light of the compressed timeline between the appointment and the trial date, (Order, Dkt. 935). When counsel withdrew, the Court appointed substitute counsel, Jeff Parras. (Order, Dkt. 995). Via Parras, Daneshjou filed a motion to reopen the suppression hearing, (Dkt. 1052), a motion to dismiss the indictment, (Dkt. 1061), and another motion in limine seeking to exclude any extraneous references to other criminal conduct, (Dkt. 1062). The Court granted Parras's motion to withdraw as counsel on January 13, 2025, (Text Order, dated 1/13/2025), and appointed standby counsel on January 17, 2025, (Dkt. 1074).

## II. LEGAL STANDARDS

### A. Motions to Suppress

#### 1. Electronic Surveillance

Federal law generally prohibits law enforcement agents from intercepting wire, oral, and electronic communications without consent, absent prior judicial approval. 18 U.S.C. §§ 2510-2520. Section 2518(1)(c) is "a statutory 'necessity requirement' designed to insure that 'wiretapping is not resorted to in a situation in which traditional investigative techniques will suffice to expose the crime.'" *United States v. Guerra–Marez*, 928 F.2d 665, 669–70 (5th Cir. 1991) (citing *United States v. Webster*, 734 F.2d 1048, 1055 (5th Cir. 1984)). This section provides that an application for authorization to intercept wire or electronic communications shall include "a full and complete

statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous[.]" 18 U.S.C. § 2518(1)(c). To approve the interception of wire (or electronic) communications, a judge must find that the Government has made the required showing of necessity. 18 U.S.C. § 2518(3)(c). This requirement is meant to ensure that wiretaps are not "routinely employed as the initial step in criminal investigation." *United States v. Giordano*, 416 U.S. 505, 515 (1974).

### 2. Fourth Amendment

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" and requires that search warrants issue only "upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. Amend. IV. "When government officials conduct a search in violation of the Fourth Amendment, prosecutors are barred from introducing evidence obtained in the unlawful search at trial." *United States v. Aguilar*, 973 F.3d 445, 449 (5th Cir. 2020). This judicially created remedy—designed to "safeguard Fourth Amendment rights generally through its deterrent effect"—is known as the exclusionary rule. *United States v. Beverly*, 943 F.3d 225, 232 (5th Cir. 2019) (cleaned up).

In reviewing a motion to suppress, the Court "engage[s] in a two-part inquiry: (1) whether the good-faith exception to the exclusionary rule applies; and (2) whether the warrant was supported by probable cause." *United States v. Laury*, 985 F.2d 1293, 1311 (5th Cir. 1993) (citing *Leon*, 468 U.S. at 922–23). "Principles of judicial restraint and precedent dictate that, in most cases, [the Court] should not reach the probable cause issue if a decision on the admissibility of evidence under the

good-faith exception of *Leon* will resolve the matter." *United States v. Craig*, 861 F.2d 818, 820 (5th Cir. 1988).

### 3. Fifth and Sixth Amendments

Under the Fifth and Sixth Amendments of the United States Constitution, after invoking right to counsel by requesting assistance of counsel, any waiver of Sixth Amendment rights by the defendant in a discussion initiated by the police is inadmissible in the prosecution's case-in-chief. *See Michigan v. Harvey*, 494 U.S. 344, 349 (1990). If a defendant wishes to invoke her Fifth Amendment right, she "need only say as much when [s]he is first approached and given the Miranda warnings" and "not only must the immediate contact end, but 'badgering' by later requests is prohibited." *Montejo v. Louisiana*, 556 U.S. 778, 795 (2009). A defendant must articulate his desire to have counsel present "sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis v. United States*, 512 U.S. 452, 459 (1994) ("[T]he suspect must unambiguously request counsel.").

The Sixth Amendment prohibits admission of statements deliberately elicited by the government from the defendant after adversary criminal proceedings have begun, unless the defendant's counsel is present or the defendant waives his right to counsel." *United States v. Gunn*, 369 F.3d 1229, 1237 (11th Cir. 2004) (citing *Massiah v. United States*, 377 U.S. 201 (1964)). A defendant may waive the right to counsel under the Sixth Amendment so long as the waiver is voluntary, knowing, and intelligent. *Montejo*, 556 U.S. at 786. It is not necessary that a defendant be represented by counsel at the time he chooses to waive the Sixth Amendment right. *Id.* A waiver is generally considered knowing and intelligent where the defendant was apprised of his *Miranda* rights,

which include the right to have counsel present during interrogation, and agrees to waive those rights. *Id.*

## III. DISCUSSION

### A. Motions to Suppress

Daneshjou has filed several motions to suppress, including: (1) a motion to suppress the contents of electronic surveillance, (Dkt. 433); (2) a motion to suppress evidence from the searches of 9601 Wier Loop, (Dkt. 435), and 2300 Portofino Drive (Dkts. 434, 666); (3) a motion to suppress statements he voluntarily made to officers, (Dkt. 432). The Court will address each in turn.

#### 1. Motion to Suppress Electronic Surveillance

The Court begins with Daneshjou's motion to suppress the contents of the Government's electronic surveillance. (Dkt. 433). During its investigation, the Government applied to this Court for authorization to intercept wire and electronic communications on April 10, 2020. (Affidavit, Dkt. 690-1). The application was approved, and the Court issued an order authorizing the interception of electronic communications. (*Id.* at 39). The Government applied to renew the order on June 10, 2020, which was also approved. (Affidavit, Dkt. 690-2).

Daneshjou alleges that the Government's electronic surveillance applications "totally fail to establish that wire intercepts are necessary." (Mot. Suppress, Dkt. 433, at 2). He argues that normal surveillance was possible and practicable, that officers were conducting searches of Daneshjou's co-conspirators prior to seeking electronic surveillance, and that normal investigative procedures could have sufficed. (*Id.* at 2–3).

The Court finds the Government's application sufficiently demonstrated the need for electronic surveillance. The Fifth Circuit has determined an application for electronic surveillance is adequate "if the affidavit explains the prospective or retrospective failure of several investigative techniques that reasonably suggest themselves." *United States v. Hyde*, 574 F.2d 856, 867 (5th Cir.

1978). "What is required is a showing that in the particular investigation normal investigative techniques employing a normal amount of resources have failed to make the case within a reasonable period of time." *United States v. Krout*, 66 F.3d 1420, 1424–25 (5th Cir. 1995) (internal quotation marks and citations omitted).

Here, the Government offered two 39-page-long affidavits in support of its wiretap applications. (*See* Affidavits, Dkts. 690-1, 690-2). These affidavits explain why traditional investigative techniques had not yet uncovered the full scope of the conspiracy, the limitations on the techniques it had been using, and the type of evidence that the Government believed would be useful from wiretaps. (Affidavit, Dkt. 690-1, at 3–6 (discussing cause of investigation); *id.* at 9–20 (discussing history of investigation); *id.* at 21–39 (discussing why electronic surveillance is needed)). The Government's application details why physical surveillance would be ineffective at monitoring hidden drug transactions, (*id.* at 22–25), why undercover agents had not been able to uncover the activities of other members of the drug conspiracy, (*id.* at 25–26), why interviews would be unhelpful, (*id.* at 27), and why search warrants, trash searches, grand jury subpoenas, and financial investigations would fail to uncover the full scope of the conspiracy, and potentially alert members to the investigation, (*id.* at 27–32). The Government's analysis noted that it had not uncovered the locations of profits earned by members of the conspiracy, the identity of these conspirators, the methods used to launder proceeds, and the sources of supply for many of the drugs.[1] (*Id.* at 6–7). These detailed explanations show, at least, the partial inability of "several investigative techniques that reasonably suggest themselves" to uncover the full scope of the criminal conspiracy. *Hyde*, 574 F.2d at 867.

Nor did the Government prematurely resort to electronic surveillance. The Government's investigation began in or before September 5, 2019. (Affidavit, Dkt. 690-1, at 9). The Government

---

[1] The renewed application contains the same analysis and reasoning. (Affidavit, Dkt. 690-2).

investigated the matter for seven months, finding evidence of drug trafficking, but was unable to obtain key pieces of information related to the trafficking conspiracy. Only after these seven months did the Government resort to electronic surveillance, explaining in detail why the surveillance was necessary.

Overall, the Government has made the requisite showing of necessity. Daneshjou's conclusory statement that the wiretaps were unlawful is insufficient to suggest otherwise. The Government need only show that "normal investigative techniques employing a normal amount of resources have failed to make the case." *Krout*, 66 F.3d at 1424–25. That burden has been met. The Court will therefore deny Daneshjou's motion to suppress the contents of electronic surveillance, (Dkt. 433).

### 2. Motions to Suppress Search Warrants

Daneshjou filed two motions to suppress the search warrant executed at his home and business location on Portofino Drive, (Dkts. 434, 666), and one motion to suppress the search on his Wier Loop property, (Dkt. 435).

### a. Wier Loop

The Court begins with the search at Wier Loop. Daneshjou contends that search violated his Fourth Amendment rights because the information contained the Government's affidavit was stale and failed to establish probable cause. (Mot., Dkt. 435, at 1–2). A review of the affidavit, however, shows that the Government and the authorizing magistrate had ample reason to believe that the Wier Loop property contained evidence related to controlled substances. (Affidavit, Dkt. 690-3, at 4–14).

In detail, the affidavit in support of the Wier Loop search outlines the Government's investigation into Prasad and his alleged drug trafficking. (*Id.* at 3). The affiant describes his work with a confidential source ("CS") that has led to multiple arrests and seizures of controlled

substances. (*Id.*). The CS informed the Government that the "entire property is being utilized to

manufacture psilocybin mushrooms. (*Id.* at 4). The CS provided Government agents with

photographs of mushrooms grown at the Wier Loop property. (*Id.*). The CS also identified several

buildings on the property and how each one was used to store, process, or grow the mushrooms.

(*Id.*). As the affidavit says:

> 9. The CS informed [the Government] that [the Wier Loop property] produced 106 lbs of psilocybin mushrooms in September 2020, however Varun PRASAD is planning to produce 240 lbs per month beginning in November 2020. The average price per pound for psilocybin mushrooms is approximately $1600.00 in the Austin, Texas area. The CS further advised that Varun PRASAD informed her he paid $450,000 for the 9601 Weir Loop Rd, Austin, Texas property and made an additional $200,000 in improvements to complete the grow operation.
>
> 10. On November 6, 2020, the CS arranged for a buy/walk of two ounces of psilocybin mushrooms from Robert Byabato for the agreed upon price of $500.00. The buy/walk was arranged to take place at 960 I Wier Loop Rd, Austin, Texas on the same date. The CS identified Robert Byabato as a known associate of Varun Prasad that acts as his driver, courier, drug distributor and a laborer at the psilocybin mushroom grow at 9601 Wier Loop Rd, Austin, Texas. The communication was made via cellular phone application "Signal" to Robert Byabato at phone number (972)439-4248 and confirmed the purchase of two ounces of psilocybin mushrooms. Robert Byabato responded to the text via "Signal" indicating he had the psilocybin mushrooms ready and instructed the CS to meet him at 960 I Wier Loop Rd, Austin, Texas. The CS and his/her vehicle were searched for currency and/or contraband with negative results and was provided with $500.00 OAF (Official Advanced Funds) for the psilocybin mushrooms and an audio/video recording device. The CS departed and was followed by Agents directly to 9601 Wier Loop Rd, Austin, Texas. DPS Air Support provided aerial video surveillance of the buy/walk. Shortly after the CS' arrival, Robert Byabato was observed arriving on-scene . . . . Robert Byabato was then seen by DPS Air Unit exiting the vehicle and making contact with the CS. The CS and Robert Byabato greeted one another briefly and entered "Building A" which is the first structure at 9601 Wier Loop Rd, Austin, Texas. The CS and Robert Byabato spoke briefly at which point Robert Byabato provided the CS with the Psilocybin Mushrooms and the CS provided Robert Byabato with the OAF (total $500.00). Once the deal was complete, the CS exited the "Building A", returned to his/her vehicle and drove directly to a location to meet with Agents. The CS provided Agents

> with the Psilocybin Mushrooms purchased from Robert Byabato at 9601 Wier Loop Rd, Austin, Texas. The CS was shown a Texas Driver's License Photograph of Robert Byabato. The CS confirmed that the person depicted in the photograph is "Robert" the person who sold him/her the two ounces of Psilocybin Mushrooms, and who is a known driver, courier and distributor for Varun Prasad. Agents later conducted a preliminary analysis test on the purchased mushrooms. The test conducted indicated positive results for psilocybin mushrooms.

(*Id.* at 5–6).

As a brief summary, the affidavit showed that Prasad had an ongoing mushroom cultivation operation since June 2020, including photographs of the grow, statements about where the operation was located, and descriptions of the property that matched aerial surveillance. The Government had also conducted a controlled buy of the illicit mushrooms. Under these circumstances, the Government and the magistrate had sufficient cause to believe that the Wier Loop property was being used for the unlawful cultivation of psilocybin mushrooms.

Nor was the information stale. The magistrate signed a search warrant 26 days after the controlled buy. Daneshjou offers no basis to believe that the mushroom farm would have ceased operations in that interim period, and indeed, the CS had told the Government that operations would be increasing—not decreasing—in the future. That 26-day period does not render the information stale.

### b. Portofino Drive

Under his original counsel, Daneshjou filed a motion to suppress the search at his home on Portofino Drive. (Dkt. 434). Like his motion as to Wier Loop, this motion similarly alleges in conclusory terms that the Government's affidavit fails to establish probable cause of any criminal

activity, that the information was stale, and that the search violated Daneshjou's Fourth Amendment rights. (*Id.*).

Upon obtaining new counsel, Daneshjou filed another motion to suppress the search. (Dkt. 666). That motion delves into greater detail, arguing that information which the Government presented in its affidavit to the magistrate were not full and truthful accounts, with the effect of falsely painting Daneshjou as a player in a drug distribution ring, instead of an innocent, unwitting businessman. (*Id.* at 1–2). The motion argues that only one phone call implicates Daneshjou, and the Government failed to include the full transcript of that phone call. (*Id.* at 3–5). Because Daneshjou believes the Government lacked evidence to show that Daneshjou was selling drugs with Prasad, he argues the Government also lacked probable cause to implicate Daneshjou in the drug trafficking ring. (*Id.* at 5–7).

### i. Factual Background of the Portofino Search

The Court begins with a factual overview of the Government's investigation prior to the Portofino house search. Before investigating Daneshjou, the Government's drug trafficking investigation had identified that Varun Prasad was likely engaged in illegal drug sales. (Affidavit, Dkt. 690-4, at 3–6). Prasad, a 23-year-old attending the University of Texas, had reported no wages to the State of Texas from 2018 to 2020. (*Id.*). However, bank records for Prasad showed several real estate dealings with Daneshjou's real estate company: DQ Design & Development LLC from August to September 2019. (Resp., Dkt. 690, at 11; Affidavit, Dkt. 690-4, at 6). Public records revealed that Daneshjou owned and lived at 2300 Portofino Drive. (Affidavit, Dkt. 690-4, at 6).

As part of the Government's electronic surveillance of Prasad, the Government intercepted a call between Daneshjou and Prasad on April 18, 2020. (*Id.*). In the call, the two discussed financing real estate deals, and Daneshjou told Prasad that Prasad needed to pay him $42,000 as part of their purchase of a property on East 32nd St. in Austin, Texas. (*Id.*). The next day, the Government

intercepted another call, where Daneshjou told Prasad about his new financial schemes, including

changing the way Prasad would deposit money for Daneshjou. The conversation follows:

> PRASAD: Oh, so instead of depositing in Chase, you're saying to deposit in this little bank.
> DANESHJOU: No, no, no, the money we need to spend…okay, the money that goes to Chase covers Weir Loop and covers thirty-second (32nd).
> PRASAD: Yeah.
> DANESHJOU: But, we have to pay people to produce work.
> PRASAD: Mm-hmm.
> DANESHJOU: The entitlement, I gotta' put fifty-five (55) and you gotta' put forty-five (45). Instead of you giving me cash, you can make it in money order and just deposit it into that account.
> **PRASAD: Isn't that sketchy as fuck?**
> **DANESHJOU: No, it's not, not at all.** As a matter of fact, to be honest we can uh . . . if you have a tenant for thirty-second (32nd). Somebody can use that fucken place as a storage. They can use it . . . [VOICES OVERLAP]
> **PRASAD:  No, I have a tenant who can use it as a trap house.**
> **DANESHJOU: As a what?**
> **PRASAD: As a trap house.**
> **DANESHJOU: What's a trap house?**
> **PRASAD: It's like where you meet people at and sell drugs out of and store your drugs there.**
> **DANESHJOU: Ah! Something legitimate, right?**
> **PRASAD: Yeah, sure.**
> **DANESHJOU: Perfect! And the fucken place is going to sit there for six (6) or eight (8) months.**
> PRASAD: Yeah, I mean [STAMMERS] we need the fucken keys to go inside.
> DANESHJOU: We close on the twenty-ninth (29th). Once, we closed on the twenty-ninth (29th), we can go in there and tear everything up.
> PRASAD: Okay, 'cause I might actually be able to get a tenant to live there.
> DANESHJOU: Well, I gotta' see if the city will give us electricity and water…[VOICES OVERLAP]
> PRASAD: Oh yeah, 'cause it's not fit for…[VOICES OVERLAP]
> DANESHJOU: …because all this shit he did they shut them all out.
> **PRASAD: …yeah, it's not fit…yeah, it's not fit to have it tenant there.**
> **DANESHJOU: Yeah, it's perfect for storage.**
> PRASAD: Yeah, that's why.
> DANESHJOU: Ah! Maybe it'll be good for…you know, conferences and meetings and that kind of stuff.[VOICES OVERLAP]
> PRASAD: Yeah, not for sure, it's a lot.

DANESHJOU: …So, we can turn it into a legitimate rental and call it… [VOICES OVERLAP]
PRASAD: Yeah, I want to see what the inside looks like.
DANESHJOU: …whatever you put up, we call it, "rent money."[VOICES OVERLAP]
PRASAD: Yeah, I want to see what the inside looks like.
DANESHJOU: … And we just put in that new bank.
PRASAD: Yeah, I know that's what I was going to do, but I want to see what the inside looks like, because I think, I might actually know a tenant
DANESHJOU: Okay, that's perfect.

(Gov. Ex. 1) (emphasis added).

On April 22, 2020, the Government intercepted a call between Prasad and Colby Pittsley, where Prasad expresses that he has "like a lot of money" through cash from his drug sales and "I have a place I can funnel it . . . I have real estate and shit, I have a couple of properties in Austin . . . ." (Affidavit, Dkt. 690-4, at 6). The Government intercepted another call on April 24, 2020, between Daneshjou and Prasad, in which the two again talk about payments for their properties. (*Id.*). Daneshjou suggests Western Union, but Prasad notes that their bank could flag payments made with Western Union. (*Id.*). They discuss creating and using an LLC for the property on E. 32nd St. (*Id.*). Daneshjou sent a wire transfer worth $10,000 for the 32nd St. Property, submitted a certificate of formation for an 801 E. 32nd LLC on April 21, 2020, and opened a business bank account for the LLC. (*Id.*). Daneshjou was listed as the sole manager for the LLC. (*Id.*). The LLC and bank account listed Daneshjou as the sole manager, and the address was 2300 Portofino Drive. (*Id.*).

In addition, the Government's affidavit showed a pattern of suspicious payments from "Nick Jones," an alias used by Daneshjou's co-defendant Drew Zarate. (*Id.*). In a call intercepted on June 18, 2020, Daneshjou asked Prasad if he had paid $1,800 to DQ Design and Development as rent, and Prasad stated that he did. However, bank surveillance footage from later that day showed Zarate—not Prasad—purchasing $1,800 in money orders at an HEB grocery store and depositing it

into Daneshjou's business account. (*Id.* at 7–8). The affiant believed this to be one of the payments that Zenker and Prasad were using to launder their drug proceeds and disguise them as rental payments. (*Id.*).

Between June 2019 and October 2020, over $133,000 of Western Union money orders were deposited into accounts owned by Daneshjou. (*Id.* at 10). Prasad (under the pseudonym "Jack Rosey") and Zarate regularly deposited these money orders into Daneshjou's business account by visiting local HEB stores and purchasing amounts less than the $3,000 required to be reported by the Bank Secrecy Act, 31 U.S.C. § 1010.415. (*Id.* at 9). The affidavit stated that this pattern is consistent with money laundering schemes, and that Daneshjou was likely using these properties and LLCs to funnel proceeds from the conspiracy's drug sales. (*Id.*).

On November 10, 2020, the Government conducted a trash run at the Portofino house. (*Id.* at 11). Investigators discovered a letter from Daneshjou's bank addressed to his 2610 S. 3d St LLC sent to his Portofino address. (*Id.*). The affiant stated that he believed Daneshjou's business records, including evidence of money laundering, were at the Portofino house. (*Id.*).

### ii. Analysis

The Court finds that this factual background, laid out in detail in the Government's affidavit, shows probable cause to believe evidence of criminal activity would be at the Portofino house.[2] The Government showed that Prasad was likely engaged in a lucrative drug trafficking operation. Daneshjou repeatedly argues that there is no evidence linking him to Prasad's drug trafficking, (Dkts. 434, 666), but this misstates the burden to obtain a search warrant. The Government need

---

[2] Because Daneshjou alleges that the Government's affidavit "was not a full and truthful account," the Court will first examine whether probable cause existed. *See United States v. Beverly*, 943 F.3d 225, 232–33 (5th Cir. 2019) (noting that good faith cannot be established where magistrate was misled by information in an affidavit the affiant knew to be false); *United States v. Dodd*, 349 F. Supp. 2d 1039, 1050 (W.D. Tex. 2004) ("The good-faith exception does not apply when an affiant omits information in her possession that would have weakened the case against the defendant.").

only show "facts which establish a nexus between the house to be searched and the evidence sought." *United States v. Laury*, 985 F.2d 1293, 1313 (5th Cir. 1993) (quotations omitted); *see also United States v. Namer*, 680 F.2d 1088, 1095 (5th Cir. 1982) ("In a search warrant case, the magistrate must have probable cause to believe that certain items evidence criminal activity and that those items are presently located at a certain place."); *United States v. Webster*, 750 F.2d 307, 318 (5th Cir. 1984) ("A search warrant, unlike an arrest warrant, may issue, without the slightest clue to the identity of the criminal, if there is probable cause to believe that fruits, instrumentalities or evidence of criminal activity are located at the place to be searched.").

Here, Prasad had made several payments to businesses and LLCs owned by Daneshjou, structuring the payments in ways to avoid detection. In a call with Daneshjou, Prasad suggested that they could use a property as a "trap house" to traffic drugs, before telling another individual that he owned properties where he could funnel the money. Prasad, who had reported no income for several years, went on to give tens of thousands of dollars to Daneshjou in the following months, including payments made by his known co-conspirator Charles Zenker. Only two days before the search warrants were signed, the Government conducted a trash run on the property, finding evidence linking one of Daneshjou's LLCs to his Portofino address. Based on the belief that Prasad was trafficking drugs and that he was using Daneshjou's properties to launder his proceeds, the Government had ample cause to believe evidence of Prasad's money laundering would be present at the house. Given the two-day period between the trash search and the search warrant, the information was not stale.

The Court next turns to Daneshjou's argument that the Government's affidavit included material omissions in its recitation of the intercepted phone call on April 19, falsely portraying Daneshjou as a participant in Prasad's scheme. (Mot. Suppress, Dkt. 666). The Government's affidavit emphasized that Daneshjou and Prasad discussed financing home purchases, Prasad's

15

statement that he can use one of the homes as a trap house, and that Prasad had asked, "Isn't that sketchy [as fuck]?" in response to Daneshjou's financing suggestion. (Affidavit, Dkt. 690-3, at 7). However, the affidavit left out other sentences from the full transcript, including Daneshjou's question, "Ah! Something legitimate, right?" (Mot. Suppress, Dkt. 666, at 4–5). Daneshjou contends that the full transcript "show[s] that Mr. Daneshjou was not only ignorant as to Prasad's meaning when he first introduced the sale of illegal drugs in the form of a 'trap house,' but that he also pressed Prasad and showed concern that whatever he was proposing was 'something legitimate.'" (*Id.* at 5).

While the Government's affidavit undoubtedly contains omissions, Daneshjou fails to demonstrate why they require suppression of the search. A defendant may show a Fourth Amendment violation by proving that the government made a false, material statement intentionally or with reckless disregard for the truth. *United States v. Alvarez*, 127 F.3d 372, 373–74 (5th Cir. 1997). If the defendant carries this burden, the court "must excise the offensive language from the affidavit and determine whether the remaining portion establishes probable cause." *Id.* (citing *Franks v. Delaware*, 438 U.S. 154, 171–72 (1978)).

Ultimately, Daneshjou fails to show that the omissions are material, that they were intentional, or that the Government would lack probable cause without references to the call. As to materiality, the central omission is that the affidavit does not include Daneshjou asking, "Something legitimate, right?" (Mot. Suppress, Dkt. 666, at 4–5). But this omission is not material because Daneshjou's question shows a desire to *appear* legitimate, not a genuine inquiry of legitimacy. The omitted material, in other words, likely supports the probability that Prasad and Daneshjou's agreement was used to launder money. Further, the omission was not made with the intent to deceive or conceal information. The affiant—APD and DEA Task Force Officer Ronald Enriquez—stated at the Court's hearing that he omitted the material for the sake of brevity and

16

because the rest of the call had already sufficed for probable cause. (Tr., at 65–66). Officer Enriquez also testified that he did not have access to the call transcript but was instead using his line sheet (a short summary of the conversation that had been intercepted). (*Id.*). The Court finds this testimony credible, and Daneshjou has failed to cast doubt on the Government's justification for the omission.[3]

Finally, even if the information had been both material and intentionally omitted, probable cause would still have existed. A search warrant is not rendered invalid if, putting aside any incorrect or unconstitutional portions of a search warrant, the remaining information is sufficient to establish probable cause. *See United States v. Karo*, 468 U.S. 705, 719–21 (1984). Here, Prasad's call to Daneshjou on April 19 was one of several calls listed in the affidavit, constituting one paragraph of evidence out of 11 pages worth of total evidence in the affidavit. (Affidavit, Dkt. 690-3, at 7). While Prasad's invocation of a "trap house" on the phone call may have been especially clear evidence of drug trafficking, the Government's remaining evidence sufficiently supported the likelihood of drug trafficking.

### 3. Statements Made to Officers

The Court next turns to Daneshjou's motion to suppress statements that he made to law enforcement officers following his arrest, which he contends were the result of an invalid *Miranda* waiver. (Mot. Suppress, Dkt. 432).

After Daneshjou was arrested, he was transported to APD offices and placed in an interview room. At the Court's hearing, the Government introduced a video of Daneshjou in the room with

---

[3] Because the Court finds that the affiant's omissions were neither intentional nor material, the good-faith exception applies. *See Dodd*, 349 F. Supp. 2d at 1050 (applying good-faith exception despite omission because "the omission would have *strengthened* the case against [Defendant]") (emphasis in original); *United States v. Payne*, 341 F.3d 393, 399 (5th Cir. 2003) (citing *United States v. Leon*, 468 U.S. 897, 926 (1984)) (explaining good-faith exception). Plainly, the affidavit contains sufficient information to allow a magistrate to rely on it in good faith.

several federal law enforcement officers. (Video, Gov. Ex. 6). The first several minutes of the video show Daneshjou voluntarily asking questions to the officers. (*Id.* at 00:00 – 02:00). Ninety seconds in, Daneshjou tells an officer that he has "always tried to stay way out of the way of whatever" Prasad and others do, at which point, the officer instructs Daneshjou to hold off on talking until another officer can have him sign a waiver of rights. (*Id.* at 01:10 – 01:40).

Three minutes in, an officer enters the room with a paper stating Daneshjou's constitutional rights. (*Id.* at 03:12). The officer tells Daneshjou, "I want you to read [your rights]" and Daneshjou replies, "I understand." (*Id.*). He then proceeds to read parts of the paper out loud while running the tip of his pen down each line. (*Id.*). He initials next to each right and says, "I understand that." (*Id.*). He initials each line and signs at the end of the waiver form. (*Id.*; Advice of Rights Waiver, Gov. Ex. 4).

As seen in the video, Daneshjou knowingly and voluntarily waived his rights. He reads out several lines, states that he understands each right, and then initials and signs the waiver form. The government has readily met its burden of showing that the relinquishment of rights was a voluntary, free, and deliberate choice.

Daneshjou's arguments to the contrary fail to show otherwise. First, he states that he did not understand his rights because he did not have his reading glasses. (Mot. Suppress, Dkt. 432, at 2). However, he is seen on video reading aloud from the paper, indicating that he could in fact read the waiver form. Daneshjou next suggests that, prior to the interview beginning, he was misled by the law enforcement officers. (*Id.* at 3; Tr., at 107–108). Ultimately, Daneshjou offers no competent evidence on this matter. When the video of the interview begins, the officers do not interrogate Daneshjou, nor do they may any promises of immunity or offer anything in exchange for his

18

testimony. Accordingly, there is no reason to believe that the officers misled Daneshjou prior to his waiver.

Finally, to the extent that Daneshjou seeks to exclude his statements prior to signing the Government's waiver form, the motion is denied because Daneshjou was not subject to interrogation or questioning. "Custodial statements are not *Miranda*-protected unless they are made as the result of 'interrogation' by law enforcement." *United States v. Burnette*, 535 F. Supp. 2d 772, 785 (E.D. Tex. 2007). *Miranda* interrogations "must reflect a measure of compulsion above and beyond that inherent in custody itself." *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980). In the three minutes of video before Daneshjou signs the waiver, the officers do not interrogate Daneshjou. To the contrary, Daneshjou asks the officers questions, who then answer the questions. (*See* Video, Gov. Ex. 6, at 00:00–03:00). Daneshjou then comments on their answers. (*Id.*). This is not "express questioning or its functional equivalent." *Innis*, 446 U.S. at 300–01. And rather than "elicit an incriminating response," the officers told Daneshjou to hold off on saying more until he has signed a waiver. *Id.* at 301; (Video, Gov. Ex. 6, at 01:30). Because Daneshjou's pre-waiver statements were not the product of any questioning or interrogation by officers, they do not qualify for *Miranda* protection.

## B. Motion in Limine

The Court now turns to Daneshjou's motions in limine. Daneshjou filed one motion in limine seeking to exclude any extraneous references to other criminal conduct. (Dkts. 431). The Court discussed and ruled on this motion at the April 9, 2024, hearing, and held that the Government shall approach the bench before introducing evidence covered by Rule 404(b). (Tr., at 125); Fed. R. Civ. P. 404(b). The Court will therefore deny his motion in limine without prejudice to Daneshjou re-urging specific objections at trial. Daneshjou has filed a second motion in limine

raising substantially the same argument. Once again, the Court will deny the motion in limine without prejudice to Daneshjou re-urging specific objections at trial.

### C. Motion to Reopen

Daneshjou, via counsel Jeff Parras, filed a motion to reopen the April 9, 2024, suppressing hearing. (Dkt. 1052). Daneshjou argues that because he was not represented by counsel at the suppression hearing, the hearing should be reopened so counsel "may further examine the Government's witnesses and make arguments as to each of the motions filed by prior counsel Stephen M. Orr and Richard Gentry." (Dkt. 1052). The Government indicates that it does not oppose the motion. (Dkt. 1055).

Nonetheless, the Court will deny the motion to reopen. Daneshjou's arguments on the motions to suppress have been fully briefed and heard. And because Parras has since withdrawn from representation, Daneshjou's arguments in favor of reopening based on Parras's late appointment no longer apply. In the motion, Daneshjou argues that counsel would not be able to effectively represent him at trial "without supplementing Mr. Daneshjou's previous, *pro se*, legally-untrained effort to conduct the hearings alone." (Dkt. 1052, at 2). Because Parras has withdrawn as counsel, he is no longer available to supplement Daneshjou's previous arguments. And apart from having his then-counsel Parras strengthen his arguments, Daneshjou offered no basis for reopening the hearing in his motion. Parras having withdrawn, no basis exists for reopening the hearing. Therefore, the motion to reopen the suppression hearing is denied.

### D. Miscellaneous April 2024 Motions

Finally, the Court will moot various motions filed after the Court held the suppression hearing on April 9, 2024, (Minute Entry, Dkt. 918), and before the Court appointed counsel Russell Hunt, Jr. to represent Daneshjou on April, 24, 2024, (Order, Dkt. 937).

First, on April 15, 2024, Daneshjou asked the Court to reconsider its decision, announced at the suppression hearing, for Daneshjou to proceed *pro se* on his previously set April 29, 2024, trial date. (Dkt. 922). Because the Court subsequently appointed counsel and cancelled the April trial date, (Dkts. 935, 937), the motion is moot. Accordingly, the Government's motion for the Court to hold a hearing on the motion is also moot. (*See* Dkt. 929).

Second, also on April 15, 2024, Daneshjou moved for the Court to assist him with preparing declarations and subpoenaing witnesses. (Dkt. 925). Daneshjou argues that because the Court at the time had not appointed him counsel, he required assistance with legal matters with which he had little experience. (*Id.*). Like the previous motion, this motion is moot because the Court subsequently appointed counsel. (*See* Order, Dkt. 937). Additionally, after granting Parras's motion to withdraw more recently, the Court appointed Daneshjou standby counsel. (Order, Dkt. 1074). The Court has explained to Daneshjou that standby counsel is available to assist him in navigating legal proceedings. (*Id.*). Accordingly, the Court finds that Daneshjou's concerns in the motion have been addressed, and the motion is moot.

## IV. CONCLUSION

For the reasons discussed above, **IT IS ORDERED** that Daneshjou's motions to suppress, (Dkts. 432, 433, 434, 435, 666), motions in limine, (Dkt. 431, 1062), and motion to reopen, (Dkt. 1052), are **DENIED**.

**IT IS FURTHER ORDERED** that Daneshjou's motion to reconsider, (Dkt. 922), motion for the Court to assist in preparing declarations and subpoenaing witnesses, (Dkt. 925), and the Government's motion for a hearing on Daneshjou's motion to reconsider, (Dkt. 929), are **MOOT**.

**SIGNED** on February 6, 2025.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE